IN THE OREGON TAX COURT
MAGISTRATE DIVISION
Property Tax

| | | |
|---|---|---|
| SUNSTONE VALLEY RIVER LLC dba Valley River Inn, | ) ) ) | |
| Plaintiff, | ) ) | TC-MD 110220N |
| v. | ) ) | |
| LANE COUNTY ASSESSOR, | ) ) | |
| Defendant. | ) | **DECISION** |

Plaintiff appeals the real market value of property identified as Account 1049434 (subject property) for the 2010-11 tax year. A trial was held in the Oregon Tax Court Mediation Center and Courtroom, Salem, Oregon, on September 8, 2011. Gregory A. Damico (Damico) appeared on behalf of Plaintiff. George Rogers (Rogers), general manager of the subject property, Thomas Callahan (Callahan), PKF Consulting President and CEO, MAI, CRE, FRICS, and Portia Howard (Howard), Tax Advisors Manager of Property Tax Division, testified on behalf of Plaintiff. David W. Sohm (Sohm), Registered Appraiser 3, Lane County Department of Assessment and Taxation, appeared and testified on behalf of Defendant.

Plaintiff's Exhibits 2, 3, 4, 5, 6, and 7 were offered and received without objection. Sohm objected to Plaintiff's Exhibit 1 because it is a restricted use appraisal, arguing that such reports are not valid in Oregon courts under OAR 161.025-0060(6). (*See* Def's Rebuttal Ex C.) Sohm stated that "USPAP standards" allow restricted use appraisal reports to be used only when the intended user does not include parties other than the client; the client is assumed to have sufficient knowledge to understand the report, whereas others could be confused or misled by the report. Damico responded that Callahan's report is "restricted" in "form" only; it is "restricted" because it is only for the purpose of this appeal. Callahan stated that his report "has all the

components of a summary report." Sohm stated that he reviewed Callahan's report, finding "very abbreviated" direct capitalization and discounted cash flow analyses, but not all of the supporting documents.[1] Callahan responded that his report provides sufficient information and identifies all assumptions. Sohm stated that he was not aware of any precedent supporting exclusion of a restricted use appraisal report in the Magistrate Division, but that the court should adopt a rule excluding such reports. The court allowed Plaintiff's Exhibit 1, noting that Sohm's objection would be considered in weighing the evidence. Defendant's Exhibit A and Rebuttal Exhibits A, C, D, and E were offered and received without objection.

## I. STATEMENT OF FACTS

The subject property is a 257-room full service hotel in Eugene, Oregon, situated along the Willamette River; it includes a restaurant, lounge, meeting space, outdoor pool, fitness room, indoor whirlpool, and sauna. (Ptf's Ex 1 at 3; Def's Ex A at 2.) The subject property is 212,345 square feet, "or an average of 826 square feet per room." (Def's Ex A at 2.) Rogers testified that the subject property guest rooms were renovated in 1996 and the meeting rooms were renovated in 2003 and 2008 or 2009. He testified that the guest rooms are overdue for a renovation and are starting to generate negative customer reviews. Callahan testified that the subject property opened in 1973 and is nearly 40 years old; as of January 1, 2010, it was "very tired and dated * * *." (Ptf's Ex 1 at 3.) Sohm determined the effective age to be 1990. (Def's Ex A at 2.)

Rogers testified that he has been in the hotel industry for 20 years and has been the general manager of the subject property for five years. He testified that, as general manager, he establishes operating budgets at the end of each year; he considers local, state, and national

---

[1] Sohm noted that Callahan's report states that it "presents no discussion of the data, reasoning, and analyses that were used in the appraisal process to develop our opinion of value. Additional supporting documentation is retained in our files." (Ptf's Ex 1 at 3.)

trends, supply issues, and any planned renovation. Rogers testified that Plaintiff's budgeted 2010 revenue was $10,437,795 and its actual 2010 revenue was $10,330,730. (*See* Ptf's Ex 1 at 10-12)[2]. Rogers testified that Callahan's projected revenues for 2010 through 2019 are reasonable assuming a $2 million renovation. (*See* Ptf's Ex 1 at 17-18.)

Callahan testified that the subject property requires a minimum capital investment of $2 million. He testified that, in the hotel industry "soft" items must be replaced every three to five years and other items (*i.e.* televisions) every five to seven years. Callahan testified that he spoke with three of the groups that made offers on the subject property and all estimated $4 to $5 million in capital investment.[3] The $2 million renovation is "a specific assumption" of Callahan's valuation of the subject property. (Ptf's Ex 1 at 3.) Sohm testified that there would not be a dollar for dollar return on investment in renovating the subject property.

A.    *Market conditions*

Rogers testified that there was an increase in market supply of hotel rooms in Eugene in 2009 and 2010. He testified that, as of January 1, 2010, there were 356 new hotel rooms in the market and more than 100 more were anticipated before 2011.[4] Rogers testified that much of the demand for hotel rooms in Eugene has, in the past, been from employees of three major recreational vehicle (RV) manufacturers in Eugene, but that demand is shrinking because one manufacturer is leaving the market in 2011 and another is downsizing. He testified that there is an annual "PAC-10" (now "PAC-12") conference in July, but Plaintiff does not have an

---

[2] Plaintiff provided corrected pages for Exhibit 1, pages 10 and 11.

[3] Rogers also testified that the subject property renovation will cost a minimum of $2 million and a maximum of $4 or $5 million.

[4] Rogers testified that the Holiday Inn added 153 new rooms in July 2008, the Comfort Suites added 73 new rooms as of November 2009, the Sleep Inn added 50 rooms in 2009, the Hilton Garden Inn added 169 new rooms in June 2011, the Holiday Inn Express expected to add more rooms in September 2011, and the Inn at the Market expected to add 66 new rooms in December 2011. He testified that, of those hotels, only the Holiday Inn is full service.

exclusive contract. Rogers testified that he thinks there will be some recovery in the Eugene hotel market, but not a full recovery due to the increase in supply. Callahan testified that there are about 900 rooms competitive with the subject property in the Eugene market. He testified that market demand is from the University of Oregon, which is very stable, and some major companies, which are declining.

Callahan testified that the hotel and hospitality market "bottomed out" in 2010. (*See* Ptf's Ex 1 at 60 ("The 2010 *Hospitality Investment Survey* indicates that we appear to have reached the bottom of the lodging investment cycle").) "According to our *2011 Trends® in the Hotel Industry* survey, which presents year-end 2010 data, the average real growth (above inflation) in net operating income (NOI) for all hotels was 8.2 percent when compared to 2009. Leading the way were full service hotels, which saw a change of 12.8 percent * * *. Limited service hotels were the only segment to decrease, as the average real NOI among these hotels declined 1.1 percent when compared to last year." (Ptf's Ex 1 at 50 (PKF Hospitality Investment Survey June 2011).)

B.      *Appraisals of the subject property*

Callahan testified that he is the President and CEO of PKF and is on the board of Ashford Hospitality Trust, the second largest public real estate investment, for which he completes valuations of acquisition properties. (*See* Ptf's Ex 2 at 1.) He testified that PKF advises clients, including major hotel companies, banks, and government agencies, in buying, developing, and acquiring hotels. Callahan testified that publically-traded real estate investors typically want properties in bigger markets such as Seattle, Portland, and Los Angeles; other investors want only a reasonable return on the investment. He testified that PKF has tracked the hotel industry since 1933 and annually publishes a compendium with statistics regarding operating expenses

and occupancy. Callahan testified that PKF has appraised over 1,000 hotels and that he has previously valued several other hotels in Eugene, including the Red Lion and the Inn at the Market. (*See id.* at 4-10.)

Callahan testified that, in preparing his appraisal, he visited the subject property, met with the hotel manager, and looked at the historical performance of the subject property. He testified that Eugene is a good, but small, market. Callahan testified that the income approach is the most reliable approach and he used both the direct capitalization and discounted cash flow approaches. Sohm determined the value of the subject property using both the income approach (direct capitalization) and the sales comparison approach. Callahan did not complete a sales comparison approach, but did identify and discuss one comparable sale, also used by Sohm. Neither appraiser determined a value under the cost approach given the age of the subject property.

1.    *Income approach -- direct capitalization*

Both Callahan and Sohm determined a value for the subject property using the direct capitalization method. (Ptf's Ex 1 at 13-14; Def's Ex A at 13.) Callahan concluded a value of $14,323,954 and Sohm concluded a value of $28,738,000 (rounded). (*Id.*) Both also considered the Smith Travel Research Host Report (Host Report) to provide relevant data; Sohm testified that he relied on the 2009 Host Report in his income approach. (*See* Def's Rebuttal Ex A.) The 2009 Host Report is described as a "report for the year 2008." (Ptf's Ex 5 at 7.) Sohm testified that it was the most recent information available to Defendant. Plaintiff, as rebuttal, supplied the 2010 Host Report, which is based on 2009 data. (Ptf's Ex 5 at 4-5.) Plaintiff provided a revision of Sohm's income approach "[u]sing [the] 2010 Host Report * * *" resulting in an indicated value of $14,557,201. (Ptf's Ex 5 at 1.) Sohm testified that 2009 was the worst year; thus, the 2010 Host study does not reflect stabilized occupancy. (*See* Ptf's Ex 5 at 4-6.)

Callahan testified that occupancy and average daily rate (ADR) are the "key drivers" in determining income potential. He testified that he considered actual operating income and expenses for the subject property. (*See* Ptf's Ex 1 at 10-11 (2007 through 2011 forecast, operating income and expenses).) Plaintiff's "2010 Budget" ADR was $94.11. (*Id.* at 11.) Callahan testified that, for 2011, 67 percent occupancy and a $98.00 ADR was forecasted for the subject property." (*See id.* at 17.) Callahan testified that, in its good years, the subject property has occupancy in the mid 70 percent range; however, it is not possible to get back to those rates in the future because of the increased supply in the Eugene hotel market. He testified that the "new" range of occupancy ranges will be around 67 percent. Callahan selected an ADR of $95 and an occupancy rate of 67 percent. (Ptf's Ex 1 at 14.)

Sohm testified that he used an ADR of $104.56, the average ADR for the subject property in 2007, 2008, and 2009.[5] (Def's Ex A at 13.) As with the ADR, Sohm testified that he used an occupancy rate of 71.4 percent, the average of 2007, 2008, and 2009.[6] Sohm testified that he considered the actual operating information from the subject property to determine revenue figures and that he relied on the 2009 Host Report to determine expenses. He testified that he believes ADR and occupancy will increase back to 2007 and 2008 levels. (*See* Def's Rebuttal Ex E (The Register-Guard article from August 25, 2011, stating that the hotel industry had bottomed out and was improving).) Sohm testified that he did not consider Plaintiff's 2010 projected budget; he considered only 2007, 2008, and 2009 actual income and expenses because real market value is based on stabilized occupancy.

/ / /

---

[5] The subject property ADR was $105.21 in 2007, $109.48 in 2008, and $98.98 in 2009. (Ptf's Ex 1 at 10.)

[6] The subject property occupancy rate was 75.4 percent in 2007, 71.6 percent in 2008, and 67.1 percent in 2009. (Ptf's Ex 1 at 10.)

Callahan determined $4,777,000 for food and beverage revenue (43.5 percent of total revenue) and $236,000 for other revenue (2.1 percent of total revenue). (Ptf's Ex 1 at 14.) Sohm determined $5,303,084 for food and beverage revenue (42.1 percent of total revenue) and $284,146 for other revenue (2.2 percent of total revenue). (Def's Ex A at 13.) In 2009, the subject property actual revenues were $4,744,399 for food and beverage (42.4 percent of total revenue) and $221,140 for other revenue (2.0 percent). (Ptf's Ex 1 at 10.)

Callahan and Sohm both distinguished between "departmental expenses" and "undistributed operating expenses." (Ptf's Ex 1 at 14; Def's Ex A at 13.) Callahan determined departmental expenses of $5,183,000 (47.2 percent) and undistributed expenses of $2,738,000 (24.9 percent). (Ptf's Ex 1 at 14.) Sohm determined total departmental expenses of $5,162,032 (41 percent) and total undistributed expenses of $3,286,074 (26.10 percent). (Def's Ex A at 13.) In 2009, the subject property actual total departmental expenses were $5,129,691 (45.8 percent) and total undistributed expenses were $2,780,299 (24.8 percent). (Ptf's Ex 1 at 10.) The 2010 Host Report stated total departmental expenses of 43.8 percent and total undistributed expenses of 27.8 percent. (Ptf's Ex 5 at 5.)

Callahan and Sohm both included as expenses management fees, insurance, and reserve for replacements. (Ptf's Ex 1 at 14; Def's Ex A at 13.) Callahan determined $330,000 (3.0 percent) for management fees, $109,000, (1.0 percent) for insurance, and $439,000 (4.0 percent) for reserves. (Ptf's Ex 1 at 14.) Sohm determined $377,710 (3.0 percent) for management fees, $151,084 (1.20 percent) for insurance, and $239,216 (1.90 percent) for reserves. (Def's Ex A at 13.) In 2009, the subject property actual management fees were $223,907 (2.0 percent), $108,527 (1.0 percent) for insurance, and $447,813 (4.0 percent) for reserves. (Ptf's Ex 1 at 10.) Sohm also included as expenses $214,035 (1.70 percent) for

franchise fees and $339,939 (2.70 percent) for property taxes. (Def's Ex A at 13.) The 2010

Host Report states expenses of 1.6 percent for franchise fees, 3.0 percent for management fees,

1.2 percent for insurance, and 1.9 percent for reserves. (Ptf's Ex 5 at 5.) Callahan determined

net operating income (NOI) of $2,185,000 (19.9 percent). (Ptf's Ex 1 at 14.) Sohm determined

NOI of $2,820,232 (22.40 percent). (Def's Ex A at 13.) In 2009, the subject property NOI,

including property taxes, was $2,139,038 (19.1 percent). (Ptf's Ex 1 at 10.) Excluding property

taxes, the subject property 2009 NOI was $2,464,608 (22.0 percent). (*Id.*)

Callahan testified that he determined a capitalization rate of 11 percent based on both

national and regional market surveys of the hotel business.[7] (*See* Ptf's Ex 1 at 49.) He testified

that he placed most weight on his work with investors in the market and some weight on investor

surveys, especially those surveys focused on the West.[8] (*See id.*) Callahan added an effective

tax rate of 1.65 percent to the capitalization rate for an overall rate of 12.65 percent. (Ptf's Ex 1

at 13.) Howard testified that she is familiar with Oregon Measures 50 and 5. Howard testified

that she calculated the tax rate of 1.65 percent using a model developed by Tax Advisors; she

divided the tax on Plaintiff's requested real market value of $14.7 million ($242,226) by the

requested real market value, for a tax rate of 1.65 percent. (*See* Ptf's Ex 3.) Howard testified

that the point of the method is to use the "proper" real market value to calculate the tax rate; use

/ / /

/ / /

/ / /

---

[7] Callahan testified that the market surveys are not based on actual transactions, but on market participants stating what would be required for a transaction to occur.

[8] Callahan testified that he also considered actual transactions, but there were only a limited number available. The only sale about which Callahan testified involved the Holiday Inn Select in Wilsonville, Oregon, on March 18, 2008. (*See* Ptf's Ex 1 at 40.) Sohm used that sale as his comparable sale 2, stating the capitalization rate as 10.96 percent. (*See* Def's Ex A at 6-7.)

of a higher real market value, such as $28 million, yields a lower tax rate (about 0.99 percent).[9]

Using the overall rate of 12.65 percent, Callahan calculated a value of $17,272,727, from which

he subtracted $2 million for "Renovation Costs" and $948,773 for the value of personal property,

for an indicated value of $14,323,954. (Ptf's Ex 1 at 13.)

Sohm determined a capitalization rate of 9.5 percent for the subject property.

(Def's Ex A at 13.) The capitalization rates of Sohm's comparable sales were 9.81 percent,

10.96 percent, 9.4 percent, and 9.52 percent, respectively. (*Id.* at 12.) Sohm testified on cross

examination that the capitalization rates of sales 1 and 4 would be 10.9 and 11.1 percent,

respectively, excluding the portions of the sales prices attributable to buyer improvements.

Sohm's sales 2 and 3 both occurred in 2008. (*Id.*) Sohm determined that the subject property

capitalization rate would be "similar" to sale 1, "lower" than sale 2, "lower" than sale 3, and

"similar" to sale 4. (*Id.*) Using the capitalization rate of 9.5 percent, Sohm concluded a rounded

value of $28,738,000.[10] (*Id.* at 13.)

2.      *Income approach -- discounted cash flow*

Callahan testified that he completed a discounted cash flow analysis. He testified that he

used a terminal capitalization rate of 11.5 percent; it is higher than the stabilized rate because of

uncertainty in the market and the age of the subject property. (*See* Ptf's Ex 1 at 9.) He testified

that the discount rate reflects yield or "return expectation[;]" he used a discount rate of 13.5

percent, which is higher than the capitalization rate due to inflation. (*See id.*) Callahan testified

that he determined those rates based on both national and regional market surveys of the hotel

_____

[9] Sohm expressed concern that Howard's method of calculating a tax rate is circular because it assumes what it seeks to prove (real market value). He stated that the Department of Revenue requires the effective tax rate to be calculated using the change property ratio. Callahan described Howard's method is "iterative," not circular. Howard testified that her method was suggested by Multnomah County when the real market value is close to the maximum assessed value. She testified that the model has matched tax calculated by counties within a few dollars.

[10] Sohm also subtracted the value of personal property, $948,773. (Def's Ex A at 13.)

business. (*See* Ptf's Ex 1 at 49.) He testified that he considers the subject property to be a "second tier" property. Callahan testified that he determined an "Indicated Value at Reversion" of $22,456,000 and subtracted 1.5 percent selling costs for "Net Cash Flow Upon Sale" of $22,119,000. (Ptf's Ex 1 at 16.) He determined the total present value to be $17,550,300 and, subtracting $2 million for renovation and $948,773 for personal property, concluded a value of $14,651,227 under the discounted cash flow method. (*Id.*)

3. *Sales comparison approach*

Sohm testified that the subject property is "venerable" and has been a premiere location for conferences. He testified that he considered comparable sales around the western region, but did not find many sales of full service hotels, likely due to the recession and lack of financing. Sohm testified that the sales that did occur were anomalies. He testified that he did not find many sales similar in size or type to the subject property, but he identified four comparable sales, all of which occurred during a "time of transition." (*See* Def's Ex A at 12.) Sohm testified that, based on his comparable sales, he determined a price per room of $120,000, for an indicated value of $29,891,000, rounded, less personal property. (*Id.*)

Sohm testified that sale 1 is a limited service hotel in Hillsboro, Oregon, that was built in 2004. (*See* Def's Ex A at 4-5.) He testified that sale 1was recorded May 7, 2010, for $13.9 million, but the sale price included "a PIP of $1.4 million" so the sale price was approximately $12.5 million. (*See id.* at 5.) Sohm calculated a price per unit of $131,132 for sale 1. (*Id.* at 12.) Using the sale price of $12.5 million yields a price per unit of $117,924. Sohm testified that sale 2 is a full service hotel in Wilsonville, Oregon, that was built in 1978; it is similar to the subject property with respect to age. (*See id.* at 6-7.) Sale 2 was recorded on March 18, 2008, for $10,950,000; the price per unit was $64,412. (*Id.*) Sohm testified that sale 3 is a limited service

hotel in Medford, Oregon, that was built in 1998. (*See id.* at 8-9.) Sale 3 was recorded

September 22, 2008, for $6,150,000; the price per unit was $97,619.05. (*Id.*) Sohm testified that

sale 4 is a full service hotel in Napa, California, that was built in 1979. (*See id.* at 10-11.) He

testified that he received information about sale 4 from another appraisal firm. Sohm testified

that the $42,000,000 sale price included $6,000,000 in renovations that the "[b]uyer was required

to spend[;]" he is not sure if the $6,000,000 has been spent yet. (*See id.*) Sohm calculated a

price per unit of $153,285 for sale 4. (*Id.*) Using the sale price of $36,000,000 yields a price per

unit of $131,386.86 for sale 4.

Sohm determined that the subject property price per unit would be "slightly lower" than

sale 1, "higher" than sale 2,[11] "higher" than sale 3, and lower than sale 4.[12] (Def's Ex A at 12.)

Sohm concluded a price per room of $120,000 for an indicated value of $29,891,000, rounded,

excluding the value of personal property. (*Id.*)

Sohm testified on cross examination that he took into account differences in NOI in

determining the weight to be given to each sale, but he did not consider the differences sufficient

to make adjustments. The subject property NOI (after reserve) per room was $8,323 in 2009.

(Ptf's Ex 1 at 10.) He testified that the approximate NOI per room of his comparable sales were:

$12,700[13] for sale 1; $7,100 for sale 2; $9,200 for sale 3; and $14,600 for sale 4. (*See* Def's

Ex A at 4-11.) Callahan testified that Sohm's sale 1 sold for $12.5 million and it is newer and

generates more income than the subject property. He testified that Sohm's sales 2 and 3 both

/ / /

---

[11] Sohm stated that sale 2 is "of similar effective age in a suburban Portland location along the I-5 Freeway[,]" but noted that "the restaurant operation was not effectively managed." (Def's Ex A at 12.)

[12] Sohm described sale 4 as a "high indication of price per unit." (Def's Ex A at 12.)

[13] Sohm reported NOI of $1,363,603 for sale 1, which has 106 guest rooms. (Def's Ex A at 4-5.) Those numbers indicate an NOI per room of $12,864.18 for sale 1.

sold in 2008 when the market was better. Callahan testified that the buyers of Sohm's sale 4 were planning a $6 million renovation with the hope of increasing the room rate.

Callahan testified that few transactions occurred in late 2009 and early 2010. Callahan identified as a comparable sale the March 18, 2008, sale of the Holiday Inn Select in Wilsonville, Oregon, Sohm's comparable sale 2. (*See* Ptf's Ex 1 at 40.) He testified that the hotel was renovated in 2002 and was in better condition than the subject property. Callahan testified that he considered a value of approximately $60,000 per unit to be reasonable for the subject property.

C.      *Offers and pending sale of subject property*

Callahan testified that most recent sale of the subject property was in 2005 at a price of $16 million. He testified that here is no way that the subject property was ever worth $30 million; there was some appreciation in the market from 2005 to 2007, but the market has been in decline since 2008. Callahan testified that the subject property was put on the market for sale in late 2010; six offers were received, ranging from $12 to $16 million. (*See* Ptf's Ex 1 at 6.) The highest offer was accepted and a sale for $16,225,000 was set to close in September 2011. (*Id.* at 7.) Callahan testified that a purchase and sale agreement was signed May 31, 2011, for $16,400,000; as part of the agreement, the buyer received a credit of $175,000 toward payment. (*See id.* at 21-27.) Callahan testified that the subject property seller is a public real estate trust, multiple bids were received, and the sale was not affected by duress or other market conditions that would render the purchase price questionable. Callahan considers the $16,225,000 price to be supportive of the January 1, 2010, value of the subject property because "market conditions for hotels and other types of commercial property have significantly improved over the past eighteen months, which would indicate that values have appreciated over this period." (*Id.* at 7.)

Sohm testified that the sale of the subject property is not final yet and the buyer has plans to renovate the subject property to improve its value. He also noted that the pending sale in September 2011 is more than a year and a half after the January 1, 2010, assessment date.

The 2010-11 real market value of the subject property was reduced to $32,455,000 by the Lane County Board of Property Tax Appeals. The 2010-11 maximum assessed and assessed values of the subject property were $18,156,133. Plaintiff requests a 2010-11 real market value of $14,651,227 for the subject property. Sohm determined a 2010-11 real market value of $28,738,000 for the subject property, but requests that the 2010-11 real market value of $32,455,000 be sustained. "Compression of the school portion of property taxes would occur if the RMV dropped below $25,364,480." (Def's Rebuttal Ex D.)

## II. ANALYSIS

The issue before the court is the real market value of the subject property for the 2010-11 tax year. "Real market value is the standard used throughout the ad valorem statutes except for special assessments." *Richardson v. Clackamas County Assessor*, TC-MD No 020869D, WL 21263620 at *2 (Mar 26, 2003) (citing *Gangle v. Dept. of Rev.*, 13 OTR 343, 345 (1995)). Real market value is defined in ORS 308.205(1),[14] which states:

> "Real market value of all property, real and personal, means the amount in cash that could reasonably be expected to be paid by an informed buyer to an informed seller, each acting without compulsion in an arm's-length transaction occurring as of the assessment date for the tax year."

The assessment date for the 2010-11 tax year was January 1, 2010. ORS 308.007; ORS 308.210.

Plaintiff has the burden of proof and must establish its case by a preponderance of the evidence. ORS 305.427. A "[p]reponderance of the evidence means the greater weight of

---

[14] All references to the Oregon Revised Statutes (ORS) and to the Oregon Administrative Rules (OAR) are to 2009.

evidence, the more convincing evidence." *Feves v. Dept. of Revenue*, 4 OTR 302, 312 (1971).

"Taxpayers must provide competent evidence of the [real market value] of their property."

*Poddar v. Dept. of Rev.,* 18 OTR 324, 332 (2005) (citing *Woods v. Dept. of Rev.*, 16 OTR 56, 59

(2002)). "[I]f the evidence is inconclusive or unpersuasive, the taxpayer will have failed to meet

his burden of proof * * *." *Reed v. Dept. of Rev.,* 310 Or 260, 265, 798 P2d 235 (1990). "[T]he

court has jurisdiction to determine the real market value or correct valuation on the basis of the

evidence before the court, without regard to the values pleaded by the parties." ORS 305.412.

"Real market value in all cases shall be determined by methods and procedures in

accordance with rules adopted by the Department of Revenue * * *[.]" ORS 308.205(2). There

are three methods of valuation that are used to determine real market value: (1) the cost

approach, (2) the sales comparison approach, and (3) the income approach. *Allen v. Dept of Rev.*

(*Allen*), 17 OTR 248, 252 (2003); *see also* OAR 150-308.205-(A)(2)(a) (stating that all three

approaches must be considered, although all three approaches may not be applicable to the

valuation of the subject property). The approach of valuation to be used is a question of fact to

be determined on the record. *Pacific Power & Light Co. v. Dept. of Revenue*, 286 Or 529, 533,

596 P2d 912 (1979). Both parties relied on the direct capitalization method. Plaintiff

determined a value under the discounted cash flow method. Defendant determined a value under

the sales comparison approach; Plaintiff identified a comparable sale. Neither party considered

the cost approach.

A.    *Income approach*

Both parties agreed that primary weight should be given to the income approach and both

parties determined a value for the subject property using the direct capitalization method. Using

the direct capitalization method, Callahan determined a value of $14,323,954 and Sohm

determined a value of $28,738,000. (Ptf's Ex 1 at 13; Def's Ex A at 13.) Callahan also determined an indicated value of $14,651,227 for the subject property using the discounted cash flow method. (Ptf's Ex 1 at 16.) Sohm did not determine a value using the discounted cash flow method. The court finds that most weight should be given to the direct capitalization method and focuses on the parties' respective analyses under that approach. The court further finds that the $2 million renovation costs estimated by Plaintiff are speculative and Callahan testified that those costs are a specific assumption of his projections using the discounted cash flow method; thus, the court gives no weight to Plaintiff's discounted cash flow analysis.

"The income method of valuation relies on the assumption that a willing investor will purchase a property for an amount that reflects the future income stream it produces." *Allen*, 17 OTR at 253 (citation omitted). "The direct capitalization method * * * focuses on two key components: (1) the capitalization rate * * * and (2) net operating income[.]" *Id.* at 253. "NOI is the currently expected net income of a property after all operating expenses are deducted from gross income. * * *. To calculate the NOI, appraisers look at historical gross income and expenses for the subject, adjusted by reference to market data. In the direct capitalization methodology, unlike a discounted cash flow or yield methodology, future NOI is not projected or estimated." *Id.* at 254, citing Appraisal Institute, *The Appraisal of Real Estate* 484 (12th ed 2001).

"The calculation of the ADR gives an overall estimate of income from rooms." *Allen*, 17 OTR at 255. The court in *Allen* considered actual ADR for the property at issue, market studies, and the market supply of hotel rooms. *Id.* Rogers and Callahan testified persuasively concerning the increased supply of hotel rooms in the subject property's market. The court finds that an ADR of $98.00 and an occupancy rate of 67 percent are reasonable based on the subject

property's performance over the three years prior to the January 1, 2010, assessment date and based on the increase in market supply. Accordingly, the court finds reasonable room revenue to be $6,159,236. The court accepts as reasonable Callahan's determination of food and beverage revenue as well as other revenue, for total revenue of $11,172,236.

"Although full-service hotels may garner a higher * * * [ADR] for their rooms, they also incur significantly higher expenses due, in part, to the costs associated with food service." *Allen,* 17 OTR at 251. In determining expenses, the taxpayer in *Allen* relied on actual expenses, the STR "Host Study," and comparable sales. *Id.* at 256. "This court has indicated a preference for an income approach that removes property taxes from expenses * * *." *Morse Hays LLC v. Benton County Assessor*, TC-MD No 100657C at 9 (July 5, 2011).[15] The subject property's actual expenses from the previous three years are similar to and often less than those reported by the 2010 Host Report. Finding that the subject property's actual expenses are reasonable in light of the market evidence presented, the court finds as reasonable for the subject property departmental expenses of 44.5 percent and undistributed operating expenses of 25 percent. The court accepts as reasonable Callahan's determination of 3.0 percent for management fees, 1.0 percent for insurance, and 4.0 percent for reserves, and the 2010 Host Report figure of 1.6 percent for franchise fees. Accordingly, the court finds the NOI to be $2,335,000, rounded.

"A cap[italization] rate is generally calculated using market sales. Slight deviations in cap[italization] rates profoundly change the estimated value of a property, making the proper calculation of the rate of paramount importance." *Allen*, 17 OTR at 260. Callahan determined a capitalization rate of 11 percent, which is supported by his market studies and Sohm's

---

[15] In *Allen*, the "[t]axpayers left property taxes out of the expenses and chose to account for them by adding the millage rate to the cap rate. The county used the maximum potential tax burden * * * as an expense." *Id.* at 259-60. The court noted that the taxpayer's method "is an accepted method of dealing with property taxes in a value appeal where the amount of the taxes is a function of the ultimate value that has yet to be determined." *Id.* at 259-60 n 12, *citing* Appraisal Institute at 513.

comparable sales.  Callahan added a tax rate of 1.65 for an overall rate of 12.65 percent.  Sohm

testified that the change property ratio (CPR) is to be used to calculate the effective tax rate,

however, he did not present evidence indicating the effective tax rate based on the CPR.  *See*

*also* OAR 150-308.205-(G)(1)(c) (" 'Effective tax rate' for any given property is the nominal tax

rate * * * multiplied by the appropriate CPR * * *").  The court has not received any reliable

evidence by which to determine the effective tax rate and relies on the capitalization rate of

11 percent for an indicated value of $20.3 million, excluding the value of personal property.

Callahan subtracted $2 million for "renovation costs" from his final conclusion of value

under the income approach.  He and Rogers testified that $2 million is the minimum investment

necessary to update the subject property.  Callahan testified that all of the groups that made

offers on the subject property anticipated at least $4 to $5 million in renovation costs.  Plaintiff's

evidence concerning the future renovation costs is speculative and is based, in part, on offers

made in late 2010 and 2011.[16]  Plaintiff's estimated renovation costs are given no weight in the

court's determination of value as of January 1, 2010.

B.      *Sales comparison approach*

OAR 150-308.205-(A)(2)(c) states, in pertinent part:

"In utilizing the sales comparison approach only actual market transactions of
property comparable to the subject, or adjusted to be comparable, will be used.
All transactions utilized in the sales comparison approach must be verified to
ensure they reflect arms-length market transactions."

"The court looks for arm's length sale transactions of property similar in size, quality, age and

location * * * in order to determine the real market value" of the subject property.  *Richardson v.*

*Clackamas County Assessor*, TC-MD No 020869D, WL 21263620 at *3 (Mar 26, 2003).

---

[16] For example, one offeror estimated a $10 million renovation.  (*See* Ptf's Ex 1 at 34.)  Callahan testified
that the offeror's $10 million estimate was purely for negotiating purposes.

Sohm determined a value of $120,000 per room for an indicated value of $29,891,000, rounded, excluding personal property, under the sales comparison approach. Callahan testified that he considers the property identified as Sohm's sale 2 comparable to the subject property and determined a price per unit of $60,000 to be reasonable for the subject property. Sale 2 is given the most weight because it is a full service hotel of similar age as the subject property. Sale 4 is given the least weight given its location and its considerably higher NOI per unit. The court finds that the price per unit as of January 1, 2010, was $87,000, for an indicated value of $21.4 million, less personal property. The sales comparison approach is given less weight based on Callahan's and Sohm's testimony concerning the lack of good comparable sales.

C.    *Pending sale of subject property*

"A recent sale of the property in question is important in determining its market value." *Kem v. Dept. of Rev.,* 267 Or 111, 114, 514 P2d 1335 (1973). "If the sale is a recent, voluntary, arm's length transaction between a buyer and seller, both of whom are knowledgeable and willing, then the sales price, while certainly not conclusive, is very persuasive of the market value." *Id*. (citation omitted). Callahan testified that the subject property was put on the market for sale in late 2010; six offers were received, ranging from $12 to $16 million. (*See* Ptf's Ex 1 at 6.) The highest offer was accepted and a sale for $16,225,000 was set to close in September 2011. As Sohm stated, the sale had not closed as of the date of trial and a sale in September 2011 is well after the January 1, 2010, assessment date.

III.  CONCLUSION

After carefully considering the evidence and testimony, the court finds that the January 1, 2010, real market value of the subject property was $20.5 million, not including the value of personal property. Defendant reported that "[c]ompression of the school portion of property

taxes would occur if the [real market value] dropped below $25,364,480," thus Plaintiff is aggrieved within the meaning of ORS 305.275(1). Now, therefore,

IT IS THE DECISION OF THIS COURT that the 2010-11 real market value of property identified as Account 1049434 was $20.5 million.

Dated this ___ day of February 2012.

ALLISON R. BOOMER
MAGISTRATE PRO TEMPORE

*If you want to appeal this Decision, file a Complaint in the Regular Division of the Oregon Tax Court, by mailing to: 1163 State Street, Salem, OR 97301-2563; or by hand delivery to: Fourth Floor, 1241 State Street, Salem, OR.*

*Your Complaint must be submitted within 60 days after the date of the Decision or this Decision becomes final and cannot be changed.*

*This document was signed by Magistrate Pro Tempore Allison R. Boomer on February 9, 2012. The Court filed and entered this document on February 9, 2012.*